IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff,*<br><br>v.<br><br>DESHAUN CURTIS JONES,<br><br>    *Defendant.* | Criminal No. 2:21-cr-17 - 1<br><br>Hon. William S. Stickman IV |

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

  Defendant DeShaun Curtis Jones ("Jones") filed a Motion to Suppress Evidence arguing that the stop of the vehicle he was driving was unlawful, and his continued detention was not supported by reasonable suspicion or probable cause.[1] (ECF No. 58). The Government filed a response arguing that the initial stop of the vehicle Jones was operating was supported by reasonable suspicion. It further contended that the officer had sufficient justification to extend the traffic stop to investigate additional criminal activity. (ECF No. 63). The Court held an evidentiary hearing on Jones's motion. The parties were given the opportunity to submit additional briefing, which they did. (ECF Nos. 66, 70 and 75). After careful consideration of the record, the evidence, and the parties' arguments, the Court will deny Jones's motion for the following reasons.

---

[1] The Court has jurisdiction over Jones's suppression motion under 18 U.S.C. § 3231.

1

I.   **RELEVANT FACTS**[2]

On January 21, 2020, North Huntingdon Township Police Officer Shane Rebel ("Officer Rebel") was parked ten feet from the side of Route 30 in his marked police vehicle, a Ford Explorer, which was equipped with high powered headlights. He had the vehicle's high beams activated and he was monitoring vehicles for violations of the Pennsylvania Motor Vehicle Code. Around 8:30 p.m., a gold BMW passed his location in the right lane heading eastbound with heavily tinted windows. Officer Rebel was unable to see anybody in the front seats. He knew the BMW was violating the Pennsylvania Motor Vehicle Code, specifically Section 4524(e)(1).[3] (May 11, 2023 Suppression Hearing Transcript ("Tr."), pp. 28-30, 54, 56-57).

Officer Rebel pulled onto Route 30 and began following the BMW.[4] He activated his vehicle's emergency lights, and the BMW slowed down, but it did not stop for nearly one-half of a mile. As Officer Rebel was following the BMW, he ran its registration through JNet using the computer inside his vehicle and learned it was registered to Keyoka Akins ("Akins"). The BMW passed by numerous parking lots, streets, and well-lit areas that it could have safely pulled into

---

[2] This section encompasses the Court's findings of fact as well as its credibility determinations. When ruling on a suppression motion, the Court takes on the role of fact finder and thus "is responsible for assessing the credibility of the testifying witnesses, weighing the evidence, and reaching any 'inferences, deductions and conclusions to be drawn from the evidence.'" *United States v. Cole*, 425 F. Supp. 3d 468, 473 (W.D. Pa. 2019) (quoting *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012)).

[3] The Court can take judicial notice of the applicable Pennsylvania Motor Vehicle Code provisions. *See Lamar v. Micou*, 114 U.S. 218, 223 (1885) ("The law of any State of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof."); *Est. of Rockwell v. Comm'r*, 779 F.2d 931, 936 n.5 (3d Cir. 1985) ("We take judicial notice of the law of Pennsylvania as expressed in statutes and court decisions."); *Dean v. Specialized Sec. Response*, 876 F. Supp. 2d 549, 556 n.4 (W.D. Pa. 2012) ("Federal courts are required to take judicial notice of state statutes.").

[4] The Court has reviewed video footage from Officer Rebel's vehicle introduced into evidence as Government Exhibits 4 (excerpt of footage) and 9 (entire footage).

and stopped. Officer Rebel notified dispatch that he did not know if the vehicle would stop. At one point, Officer Rebel hit the emergency siren. After approximately one minute, the BMW pulled onto the shoulder of Route 30 instead of pulling into a parking lot with numerous empty parking stalls. (*Id.* at 5, 30, 32-33, 58-59; Government Exhibits 4 and 9, 19:47:42-19:48:27). Officer Rebel's "awareness was heightened." (*Id.* at 33). The BMW's failure to pull over despite numerous opportunities to do so was an indicator of criminal activity to Officer Rebel. Additionally, based on his training and experience, what the BMW did was consistent with "white-lining," which occurs when a subject wants an "officer to be off of their game" and pay more attention to the traffic behind them. (*Id.* at 33, 59-60).

Officer Rebel's supervisor, Sergeant Justin Wardman ("Sergeant Wardman"),[5] arrived with his K-9 partner. He heard Officer Rebel's dispatch report and was in the area of Route 30 traveling west. Both vehicles actually passed him. According to Sergeant Wardman, the windows of the BMW were "pretty much blacked out," so that "[y]ou cannot see anybody inside." (*Id.* at 4-5, 7, 10; Government Exhibit 2).

Officer Rebel approached the front passenger window of the BMW and was still unable to see inside. He knocked on the window to get the BMW's occupant(s) to roll down the window. As the window lowered, Officer Rebel immediately smelled the odor of raw marijuana emanating from inside.[6] Jones was the driver, and a female was sitting in the front passenger

---

[5] Sergeant Wardman has been employed with the North Huntingdon Township Police Department for sixteen years. In 1996, he began working as a police officer for the City of Uniontown. After that, he worked for Elizabeth Township. (*Id.* at 4). The Court has reviewed video footage from his vehicle's dashcam introduced into evidence as Government's Exhibits 2 (excerpt of footage) and 7 (entire footage)).

[6] Officer Rebel has been a police officer for over five and a half years. He has initiated hundreds of traffic stops for violations of Pennsylvania's Motor Vehicle Code. Primarily, he investigates narcotics and he has extensive training to do so. (Tr. at 26-28). In his career, Officer Rebel has

3

seat. (*Id.* at 34-35). Officer Rebel asked for Jones's license, registration, and proof of insurance. Jones only gave Officer Rebel a Pennsylvania identification card. This immediately raised Officer Rebel's suspicion that Jones did not have a valid driver's license. Officer Rebel then asked the female to identify herself, and she identified herself as Akins and provided a change of address card. Officer Rebel again asked for the registration and insurance. Jones pulled out a title from the center console. Officer Rebel continued to ask for the required documents – i.e., registration and proof of insurance. By two and half minutes into the traffic stop, Officer Rebel still had not obtained the requested documents.[7] Akins eventually located the registration in the glove box. During all of this, Officer Rebel observed that Jones was more nervous than drivers he typically encounters during traffic stops. When Akins closed the glove box, Officer Rebel noticed a brick wrapper between her legs at her feet. It was packaging paper for heroin with a blue Popeyes stamp.[8] (*Id.* at 38-42, 44, 60). He knew the heroin packaging material was a violation of "Title 35 780-113A32 paraphernalia." (*Id.* at 43).

At that point, which was only three minutes from when Officer Rebel first approached the vehicle on foot, Officer Rebel asked Jones to step out of the BMW and come to the rear of the vehicle. Officer Rebel asked if Jones had any weapons on him. Jones stated that he did not.

---

conducted over several hundred narcotics related arrests and investigations at least half of which involved marijuana. (*Id.* at 26-27). He became familiar with the odor of marijuana during his youth – nearly everyone in his neighborhood smoked marijuana. He's smelled raw or unburnt marijuana, which has a particular odor, thousands of times. According to Officer Rebel, burnt marijuana has a smoky smell, similar to a log being burned. (*Id.* at 28, 26, 61-62).

[7] Officer Rebel provided credible testimony as to the typical course of events during a traffic stop, which usually lasts fifteen minutes. (*Id.* at 35-38).

[8] Officer Rebel participated in numerous undercover narcotics purchases in his career, and he has personally bought bricks of heroin (i.e., 50 stamp bags containing heroin or fentanyl). The Popeyes logo on the paper was significant to him because less than one month before, on December 28, 2020, a fatal overdose occurred in North Huntingdon and stamp bags with the exact same logo were found lying next to the deceased. (*Id.* at 40-41, 61).

4

When asked if he would consent to a pat-down, Jones said yes. A pat-down was conducted and no weapons were found on Jones. Officer Rebel then ran the vehicle information through dispatch as well as an inquiry into whether Jones had a valid driver's license. Almost seven minutes into the entire encounter (from the point at which Officer Rebel began to follow the vehicle), dispatch notified Officer Rebel that Jones's license was expired (and suspended), and that he did not have a concealed carry permit for a firearm. On the other hand, dispatch notified Officer Rebel that Akins had a valid driver's license and a valid permit to carry a concealed firearm. (*Id*. at 44-46, 63; Government Exhibit 9, 19:48:46-19:54:20).

Officer Rebel left Jones at the rear of the vehicle and returned to the passenger side to ask Akins if she had located the BMW's insurance information. She replied no. He then asked her about the odor of marijuana in the vehicle, if there was marijuana in the vehicle, if they had been around anyone who had or smoked marijuana, and if she had a medical marijuana card. Akins said no to all of Officer Rebel's questions. Akins was asked to exit the vehicle, and she complied. When Officer Rebel asked Jones the same questions, he replied no. Then, when asked for consent to search the vehicle, Jones said no. (*Id*. at 47-48, 63; Government Exhibit 9, 19:54:32-20:01:02).

Approximately thirteen minutes after Officer Rebel pulled over the BMW, the K-9 officer, Rocco, walked around the vehicle with Sergeant Wardman to conduct a sniff. Rocco positively alerted to narcotics on the driver's side door seam between it and the rear passenger door.[9] As a result of military service, Sergeant Wardman cannot smell anything. He notified Officer Rebel of Rocco's positive alert to the odor of narcotics from the vehicle. (*Id*. at 9-13, 16-19, 67; Government Exhibit 9, 20:01:03 – 20:01:34).

---

[9] Rocco's certification was valid, and he has no history of giving false alerts. (Tr. at 13-15, 24-25; Government Exhibit 6).

Officer Rebel then handcuffed Jones and advised him that he was under arrest. Officer Rebel asked Akins if there was anything illegal inside the vehicle. She said that Jones had illegal items inside the vehicle, but she did not know what they were. Akins gave verbal and written consent to search the vehicle. Prior to the search commencing, Jones called Officer Rebel to where he was standing and said that he had illegal items inside the vehicle and that everything belonged to him. (*Id.* at 48-49, 64). More specifically, Jones said that he had cocaine, heroin, and marijuana, and that it was located in the glove box and backseat of the BMW. Contraband was recovered from the vehicle, including .342 grams (approximately three-quarters of a pound) of marijuana from the backseat in a garbage bag – it was not vacuum-sealed. (*Id.* at 50-51).

## II.   ANALYSIS

The Fourth Amendment safeguards the "right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV.[10] "As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). The starting point is to determine whether the seizure

---

[10] Article 1, Section 8 of the Pennsylvania Constitution is the state analogue to the Fourth Amendment of the federal constitution. The Pennsylvania Supreme Court has recognized that Article I, Section 8 of the state constitution provides broader protections than the Fourth Amendment. *Commonwealth v. DeJohn*, 403 A.2d 1283 (Pa. 1979). Jones does not allege any violation of his right to privacy based upon Article I, Section 8 of the Pennsylvania Constitution. This is because the United States Court of Appeals for the Third Circuit has held that a defendant's state-secured rights, constitutional or otherwise, are of no consequence when the defendant is prosecuted by the federal government. *United States v. Rickus*, 737 F.2d 360, 363–64 & n.1 (3d Cir. 1984); *United States v. Bedford*, 519 F.2d 650, 653–54 & nn.1–3 (3d Cir. 1975); *United States v. Scolnick*, 392 F.2d 320, 323–26 (3d Cir. 1967); *cf. United States v. Shaffer*, 520 F.2d 1369, 1372 (3d Cir. 1975); *United States v. Armocida*, 515 F.2d 49, 51–52 (3d Cir. 1975); *United States v. Stiver*, 9 F.3d 298, 300 (3d Cir. 1993) ("Evidence obtained in accordance with federal law is admissible in federal court—even though it was obtained by state officers in violation of state law." (quoting *Rickus*, 737 F.2d at 363–64)). The Court must judge the officers' conduct solely under federal standards as it must decide evidence questions on the basis of federal, rather than state, law.

occurred without a warrant. When a defendant, like Jones, asserts that the Government seized him without a warrant, he easily clears his initial burden. "The burden then shifts to the government to prove by a preponderance of the evidence that the officer's seizure of the defendant reflected the protections of the Fourth Amendment." *United States v. Wilburn*, No. 18-115, 2021 WL 1310423, at *22 (W.D. Pa. Apr. 8, 2021) (citations omitted). As there is no dispute that Jones was seized without a warrant (through the traffic stop), the Government bears the burden of showing that the Fourth Amendment was not violated. The Court finds that it did so for the following reasons of law and fact.

### A. A valid traffic stop occurred.

"A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). Further, "[i]t is well-established that a traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations." *United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 1997) (citations omitted). It need only be supported by reasonable suspicion that a traffic violation occurred.[11] *United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018) (citations omitted). In other words, while reasonable suspicion is "a generally undemanding standard," a police officer bears the "initial burden of providing . . . specific, articulable facts to justify a reasonable suspicion to believe that an individual has

---

[11] This standard is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Delfin-Colina*, 464 F.3d at 396 (citations omitted). In assessing reasonable suspicion, a court must examine the totality of the circumstances, *United States v. Silveus*, 542 F.3d 993, 1000 (3d Cir. 2008), through the lens of officer training and experience, *see United States v. Cortez*, 449 U.S. 411, 418 (1981). The Third Circuit has given considerable deference to police officers' determinations of reasonable suspicion. *See, e.g., United States v. Nelson*, 284 F.3d 472, 482 (3d Cir. 2002).

violated the traffic laws." *Delfin-Colina*, 464 F.3d at 397 (cleaned up) (citations omitted). "[A]ny technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806 (1996)); *see also United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) ("[P]retextual traffic stops supported by reasonable suspicion do not run afoul of the Fourth Amendment.").

The Court holds that a valid traffic stop occurred. Officer Rebel observed the BMW drive past him while he was monitoring traffic on Route 30. Its windows were so darkly tinted that he was unable to see any occupants inside, which Officer Rebel knew to be a violation of Section 4524(e)(1) of Title 75 of the Pennsylvania Code.[12] That section of the Pennsylvania Motor Vehicle Code states that it is a violation to drive a vehicle "with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or wide window of the vehicle." 75 Pa. C.S. § 4524(e)(1). In addition to Officer Rebel's observations, (1) Sergeant Wardman observed that the windows of the BMW were "pretty much blacked out," so that "[y]ou cannot see anybody inside." (Tr. at 4-5, 7, 10; Government Exhibit 2); (2) the dash cam videos from Officer Rebel and Sergeant Wardman's

---

[12] Officer Rebel need not have been factually accurate in his belief that a Pennsylvania traffic law had been violated. So long as he held a particularized and objective basis for suspecting a traffic violation, the stop does not offend the Constitution. *Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014) ("To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" (citation omitted)). The Court finds that Officer Rebel reasonably believed a violation of the Pennsylvania Motor Vehicle Code had occurred. *See Delfin-Colina*, 464 F.3d at 399-400 ("an officer's Fourth Amendment burden of production is to (1) identify the ordinance or statute that he believed had been violated, and (2) provide specific, articulable facts that support an objective determination of whether any officer could have possessed reasonable suspicion of the alleged infraction. As long as both prongs are met, an officer's subjective understanding of the law at issue would not be relevant to the court's determination.").

vehicles captured the blacked-out state of the front passenger window (Government Exhibits 2, 4, 7, 8 and 9); and (3) even in the well-lit police garage, it was nearly impossible to see through the BMW's windows (ECF No. 63-3 at 2 and 3; Government Exhibit 3; Tr. at 51-52). The Court holds that the stop of the vehicle Jones was operating was reasonable under the Fourth Amendment as it was a lawful traffic stop. *See Whren*, 517 U.S. at 810; *Moorefield*, 111 F.3d at 12.

### B. Sufficient justification existed to extend the traffic stop.

In his post-hearing brief, Jones advances no argument other than that "the stop was illegal." (ECF No. 75, p. 4). However, in his motion, Jones also argued that "all evidence obtained after Rebel requested a dog sniff was obtained in violation of Mr. Jones's constitutional rights [. . .]." (ECF No. 58, pp. 12-13). As such, evidence was adduced at the suppression hearing regarding what transpired during the traffic stop. The Court is unclear as to whether Jones is now only challenging the stop of the BMW. Regardless, it holds that Officer Rebel had reasonable suspicion (and probable cause) to extend the traffic stop.

"After a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003). As "[t]he Supreme Court has repeatedly recognized," "traffic stops are dangerous encounters that result in assaults and murders of police officers." *Moorefield*, 111 F.3d at 13 (citations omitted). It is well-settled that a police officer executing a valid traffic stop "may exercise reasonable superintendence over the car and its passengers." *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004). Thus, after a car has been legally stopped, "the police may 'escalate' the encounter by visually inspecting the

9

interior of the car, and checking credentials and asking questions of the occupants." *Mosley*, 454 F.3d at 252.

"[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *United States v. Jacobsen*, 466 U.S. 109, 124 (1984). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* "In describing what inquiries qualify as 'unrelated,' *Rodriguez* drew a distinction between 'ordinary inquiries incident to' a traffic stop, which serve the purpose of enforcing the traffic code, and other measures aimed at detecting criminal activity more generally." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (citing *Rodriguez*, 575 U.S. at 355) (internal citation omitted). Ordinary inquiries "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. "To lawfully extend a stop beyond when tasks tied to its initial mission are completed or reasonably should have been completed, an officer must have an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring." *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) (citing *Rodriguez*, 575 U.S. at 355; *United States v. Clark*, 902 F.3d 404, 410 (3d Cir. 2018)). If an officer possesses reasonable suspicion of criminal activity prior to extending the traffic stop, no violation of the Fourth Amendment has occurred. *See id.*

Here, as soon as Officer Rebel approached the BMW and Akins rolled down the passenger's side window, Officer Rebel smelled the odor of raw marijuana emanating from inside the vehicle. "It is well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." *United States v. Registe*, 830 F. App'x 708, 710 (3d Cir. 2020) (explaining that Third Circuit case law recognizes that the smell of marijuana can provide probable cause (citing *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006))); *see also United States v. Jackson*, 682 F. App'x 86, 87–88 & n.1 (3d Cir. 2017) (recognizing that an officer has probable cause to arrest "[s]o long as an officer smells the odor of marijuana and can localize its source with sufficient particularity"). Thus, the smell of marijuana alone provided reasonable suspicion for Officer Rebel to extend the traffic stop, particularly when it was combined with Jones not immediately pulling the BMW over and then "white-lining" when he eventually stopped the vehicle.

Officer Rebel developed further reasonable suspicion. In response to Officer Rebel's request for Jones's driver's license, registration, and proof of insurance, Jones only gave Officer Rebel a Pennsylvania identification card. This caused Officer Rebel to suspect that Jones did not have a valid driver's license. Then, it took minutes for Jones and Akins to locate the registration and insurance documents. During that time, Officer Rebel believed Jones was acting more nervous than drivers he encounters during typical traffic stops. When Akins located the registration in the glove box and closed it, Officer Rebel noticed a brick wrapper between her legs at her feet, which he knew to be packaging paper for heroin. At that point, the totality of circumstances were such that Officer Rebel had sufficient reasonable suspicion of criminal activity beyond the traffic violation. In fact, Officer Rebel had probable cause that the vehicle contained evidence of a crime – possession of drug paraphernalia. Officer Rebel removed Jones

from the vehicle, patted him down and ran his information through dispatch only to discover that Jones did not have a valid driver's license.

As to the *Rodriguez* moment, the Court finds that it occurred when Officer Rebel returned to the vehicle and asked Akins about the odor of marijuana emanating from the vehicle, if there was marijuana in the vehicle, if they had been around anyone who had or smoked marijuana, and if she had a medical marijuana card. She said no to all of Officer Rebel's questions. When Officer Rebel asked Jones the same questions, he too replied no. Prior to this point, Officer Rebel never veered away from the on-mission tasks associated with a traffic stop. Any delay in Officer Rebel conducting his routine traffic stop tasks was due to Jones's and Akins's failure to locate any of the necessary documents thus preventing Officer Rebel from checking Jones's driver's license, determining whether there were any outstanding warrants for him (or Akins), and inspecting the BMW's registration and proof of insurance. The Court finds that Officer Rebel was reasonably diligent; there is no evidence to suggest that he deviated from the mission of his traffic stop or that he purposefully delayed tasks related to the traffic stop. During the traffic stop he developed reasonable suspicion of criminal activity beyond the traffic violation. What's more, what occurred established the requisite probable cause that the vehicle contained evidence of a crime. Extending the stop to conduct a dog sniff was lawful.[13]

### III.   CONCLUSION

For the foregoing reasons of law and fact, the Court concludes that Jones's Fourth Amendment rights were not violated. The initiation and execution of the traffic stop was

---

[13] A canine sniff is not aimed at ensuring the safety of vehicles on the road but at "detect[ing] evidence of ordinary criminal wrongdoing." *Rodriquez*, 575 U.S. at 355 (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)). It is well established that Rocco's positive alert while sniffing the exterior of the car provided the officers with probable cause to search the car without a warrant. *United States v. Pierce*, 622 F.3d 209, 213 (3d Cir. 2010); *see also United States v. Johnson*, 742 F. App'x 616, 622 (3d Cir. 2018).

constitutional. Jones's Motion to Suppress Evidence (ECF No. 58) will be denied. An Order of Court will follow.

BY THE COURT:

/s/ William S. Stickman IV
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

8-24-2023
Date